UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| United States | ) | |
| | ) | |
| v. | ) | Case No. 12-CR-10024-PBS |
| | ) | |
| | ) | |
| Joshua Dunfee | ) | |

AFFIDAVIT OF JOSHUA DUNFEE IN SUPPORT OF HIS
MOTION TO SUPPRESS

I, Joshua Dunfee, do state and depose that the following is the truth to the best of my knowledge and belief:

1.      I am the defendant named in the above-captioned indictment.

2.      In the early morning of November 3, 2011, I was at the home I shared with my wife at 4074 Main Street Mills, Oxford Junction, Iowa. I did not own this home, but lived there on a part-time basis and also lived at 212 North Main, Onslow, IA 52321. On this day, I was at 4074 Main Street Mills.

3.      At about 7:00 am, I had just woken up and my wife had left for work. My wife called me to tell me that she had let one of our dogs into the house because it had escaped from its pen. Dressed only in my boxer shorts, I took the dog outside to put it back in its pen. While placing the dog in its pen, several law enforcement officers came from around the side of the house with weapons drawn. As several agents entered the house, one agent approached me and identified himself as Postal

1

Inspector Scott Kelley. Prior to that date, I had never been arrested and had never been given *Miranda* warnings.

4.     I was allowed inside to secure two other dogs that had remained in the house, to use the restroom, and to put on clothes. Inspector Kelley remained at my side throughout and warned me not to try to "take off." After I got dressed, Inspector Kelley told me I had to sit in his vehicle and wait. I complied with his order.

5.     Inspector Kelley started talking to me immediately without reading me Miranda rights. He asked about some baby items in the house and about my wife. I informed him that my wife was about three months pregnant. Inspector Kelley asked if the pregnancy was planned. I told him that we had been trying for two years and that my wife had two prior miscarriages.

6.     Inspector Kelley told me that he "could" read me my Miranda rights but that if he did, I would no longer be 'just helping them out.' Inspector Kelley said that I should just cooperate without him reading me my rights or things would "go bad for me." Inspector Kelley also said that if he read me my rights, he would have to also arrest my wife, Barbie, and that I should "want to avoid that kind of stress for her in her condition." I understood this to be a reference to her pregnancy. Inspector Kelley said that this would be 'just a conversation between two guys.'

7.     Among other things, Inspector Kelly asked me if I knew anything about Hunt Photography. I responded that someone claiming to either work for or own Hunt Photography had contacted my sister-in-law, Ashley Hubbard, and

2

offered her money to participate in a pornographic photo and video shoot. Inspector Kelley then asked me if I thought she [Ashley Hubbard] was "hot." I responded that whether she was "hot" is a matter of opinion. Inspector Kelley asked whether she was "hot" again stating something similar to: 'come on, you can tell me – this is just one guy to another, is she hot?' Inspector Kelley then asked if I had ever had sex with her. When I hesitated to answer, he stated that I had to answer all of his questions otherwise I would no longer be "just helping out" and he would arrest both my wife and I, and that we would still have to answer his questions anyway.

8.      At that time, I believed that an unknown person had accessed my Facebook and other internet communication accounts. I believed that I was simply helping Inspector Kelley find that person. I did not know that I was a suspect. He never told me that I was a suspect or the target of a criminal investigation. I realized after my conversation with Inspector Kelley that these incidents might be related to several break-ins that had occurred at that house previously.

9.      Inspector Kelley never asked me if I could read or write English and never asked me if I had graduated high school.

10.     During the conversation, Inspector Kelley put two sets of forms in front of me. One set was a packet of computer printouts of a Facebook chat. The other set of forms he obtained from a female officer after the search of my home had been underway for some time and was almost complete.

11.     During our conversation, Inspector Kelley repeatedly called me a liar and stated that my computer was "loaded with porn."

12.     Inspector Kelley continued to question me at the same time as he instructed me where to sign and where to initial.  I was distracted by his questions and did not fully understand what I was signing or why.  Inspector Kelley told me that the purpose of the forms were so that they could search my car. The Miranda form was placed partially underneath the consent to search form for the car, so that I believed that I was signing only the consent to search form. At that moment, I was not aware that I was signing a waiver of my Miranda rights. I felt that I could not leave his car without signing the forms and answering the questions.

13.     I signed the first set of computer printouts with my initials, but I did not state that I sent the messages or that I had written what was printed on them. Inspector Kelley explicitly stated that by signing my initials I was only indicating that I had looked at the printouts. I believed that my initials indicated only that I had looked at the printouts. I never intended to indicate that the statements made in the printouts were my own.

14.     At the end of our conversation, he wanted me to sign a statement that he had written out on a notepad. I refused to sign it because it did not accurately state what I intended to state. I was never told that I was free to leave and at no time did I feel that I was free to leave.

15.     Inspector Kelley requested that I accompany him to the Jones County Sheriff's Office in Anamosa, Iowa. Inspector Kelley said to me "you won't have any problems coming down to the Sheriff's office while we go over things, just in case we have any more questions?" An officer stood behind me, Inspector Kelley stood to one

side of me, and a Jones County Sheriff's Deputy stood in front of me with one hand on his pistol and a pair of handcuff in his other hand. I did not think that I had a choice and I believed they would use force if I did not comply. I was placed in handcuffs with my hands in front of my body and driven by the Sheriff's Deputy to the Sheriff's Office, which is located in the basement of the Jones County Courthouse in Anamosa, Iowa.

16.    When I arrived at the Sheriff's Office, they removed the handcuffs and told me to wait in the lobby of the Jones County Courthouse. Inspector Kelley said that they would be back to check on me. I was never told that I could leave. At one point, Inspector Kelley told me that my wife had called. I asked Inspector Kelley if I could use the restroom. He laughed and said that I could. I stated to him that I believed I had to ask for permission because I had been handcuffed and told that they would be checking on me.

17.    I went downstairs to the Sheriff's Office and asked for Inspector Kelley. I was allowed to call my wife. After a while, Inspector Kelley, the Sheriff's Deputy who had driven me, and the female officer from the search of my house approached and informed me that there was a warrant for my arrest.

18.    Inspector Kelley placed me in handcuffs with my hands behind my back and I was taken to his SUV. The female officer drove Inspector Kelley and me to the jail in Cedar Rapids.

19.    My alleged statements to Inspector Kelley were not freely and voluntarily given and I did not have knowledge of the consequences of those

statements. When I began speaking to Inspector Kelley I believed that he understood me to be reporting to him that an unknown third party had been accessing my home and computers without my consent.

Signed under the pains and penalties of perjury this __18__ day of September 2013.

_____ *Josh Dunfee* _____
Joshua Dunfee