UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES of AMERICA,       )
                                )
                                )CRIMINAL NO. 12-CR-10024-PBS
          v.                    )
                                )
JOSHUA DUNFEE,                  )
              Defendant.        )
_____)


**MEMORANDUM AND ORDER**

December 9, 2013

Saris, C.J.

**INTRODUCTION**

Defendant, Joshua Dunfee, charged with violations of sexual exploitation laws, seeks to suppress statements made in an interview with law enforcement during the execution of a search warrant at his house on the grounds that he was not timely informed of his <u>Miranda</u> rights, and that his statements were involuntary because the police threatened to arrest his pregnant wife if he refused to speak with them. The government argues that defendant was not in custody during the interview, he was properly given his <u>Miranda</u> rights, and no threats were issued. United States Postal Inspectors Scott Kelley and Tina Nobis, Jones County Deputy Sheriff Brian Eckhardt, and defendant testified at an evidentiary hearing before this Court on November 12, 2013. Finding defendant's

1

testimony generally not credible, the Court **DENIES** the Motion to Suppress (Docket No. 94).

## FINDINGS OF FACT

Defendant is a 31-year-old male with no prior criminal history. Although he dropped out of high school, he subsequently acquired his G.E.D. He is computer-literate: he owns several hard drives and a number of computers, some of which he built himself. He also configured some of the operating systems. He is married to Barbara (or Barbie) Dunfee, who was in the first trimester of her pregnancy at the time the search warrant was executed.

## 1. The Investigation

On October 4, 2011, members of the Attleboro Police Department were informed that a mother had been conversing online with a man named John claiming to be a professional photographer for Hunt Photography, located in Pembroke Pines, Florida. After learning that the mother had a 10-year-old daughter, John told the mother that a client was offering $20,000 for a mother-daughter bikini photo shoot in Florida. He told the mother that before the shoot could happen, she had to show him what both she and her daughter looked like wearing only bikinis. The mother took her daughter out of school and placed her in front of a webcam streaming to John's computer. At John's insistence, she first dressed her daughter in bra and panties, then posed her naked and exposed her breasts and genitalia up-close on the webcam.

2

Through investigation, law enforcement traced the IP address associated with John and acquired subscriber information for Josh and Barbie Dunfee at 4047 Main Street Mills, Oxford Junction, Iowa. Law enforcement then obtained a search warrant for the residence located at that address. Early in the morning on November 3, 2011, federal and local officers met at the nearby Jones County Sheriff's office to prepare for execution of the warrant. The briefing included a Department of Motor Vehicles photo of defendant but no explicit warnings of violence or likely gun possession.

**2. The Search**

At 7:39 a.m. and in chilly weather (about 40°F), six officers, including Kelley, Nobis, and Eckhardt, pulled up to the residence. While Nobis and Kelley arrived in unmarked vehicles, at least some of the other officers drove patrol cars, although none of these had sirens on or lights flashing. Some of the cars were used to block exits from the property to secure the area. All officers wore bulletproof vests, and at least one officer's gun was initially unholstered. One officer was in uniform, the rest in plainclothes.

Defendant, who had just woken up several minutes earlier to take one of his dogs out of the house, was outside in the yard clad only in boxers or pajama bottoms with a naked torso when the officers arrived. His wife had already left for work. Kelley, the lead investigator on the case, approached defendant with the warrant in one hand and his weapon, pointed toward the ground, in

the other. Law enforcement approached defendant, showed identification, and told him to place his dog in its kennel in the yard. Kelley, who at this point had holstered his weapon, explained to defendant that the officers were there to conduct a search and handed him a copy of the warrant. He did not pat down or handcuff defendant. Kelley asked him if anyone or any other dogs were in the house, to which defendant (curiously) answered no, and that his wife was already at work. In fact, there were two dogs still in the house. Kelley informed defendant that he was not free to leave until the residence was secured. He also told defendant that they would have an opportunity to speak further after that.

As defendant waited outside with Kelley, several other officers, including Nobis and Eckhardt, entered the house. As per procedure, the officers had their weapons drawn to clear the home. They encountered a growling Great Dane the officers described as the size of a "horse," and went back outside to ask for defendant's assistance. Still accompanied by Kelley, defendant entered the home among the officers who still had their weapons drawn but held in the "sul" position (close to the body and pointing toward the ground). Defendant brought the other dogs outside and was then allowed to return to the house to put on clothes. When he went to the bathroom, he was told to keep the door open. The entire process of arriving at the residence, delivering the search warrant, and securing the property, including defendant's participation to

4

collect his dog, took about seven minutes. <u>See</u> U.S. Exh. 5 (Eckhardt called in arrival at residence at 7:39 a.m. and called in entry made and "all clear" at 7:46 a.m.). Kelley remained with defendant the entire time.

## 3. The Interrogation

The home that day was in "deplorable" condition, extremely cluttered and odorous because of trash and dog excrement. The stench of feces was so strong that, despite the cold, the officers opened the windows of the home to let in air. Kelley led defendant out of the house and, because there were no clean places to sit inside and it was cold outside, he asked defendant to speak with him in an unmarked SUV, which was running with the heat on. Defendant sat on the passenger side of the vehicle, and Kelley sat next to him in the driver's seat. Defendant was not handcuffed.

From the vehicle Kelley called to Nobis, who went to his open driver's side window and stood there to observe while he administered the <u>Miranda</u> warnings. Kelley provided defendant with a written form explaining his <u>Miranda</u> rights.[1] Defendant had never

---

[1] The official form, entitled "U.S. Postal Inspection Service: WARNING AND WAIVER OF RIGHTS," has three main sections. The top is filled in with the place (4074 Main St. Mills, Oxford Junction, IA), date (11/3/11), and time (7:45 a.m.) that the form was given. The second section, entitled "WARNING: BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS," contains the <u>Miranda</u> warnings as five individual bullet points, each of which was initialed by the defendant. Following these is a statement that the individual read and understood these rights, below which defendant signed and noted the date (11/3/11) and time (7:50 a.m.). The third section, entitled "WAIVER," contains a statement that the

been arrested nor given Miranda warnings before. Kelley asked
defendant if he could read and write English (defendant answered in
the affirmative) and his education level (high school). Kelley told
him that he was not under arrest. Kelley next asked defendant to
read through the list of rights on the Miranda form, to initial by
each one if he understood it, and to ask questions if he had any.
Kelley and Nobis watched as defendant spent five minutes reading
the form and initialing beside each right. Defendant then signed
below the statement on the form attesting that he read and
understood his rights. Kelley then asked if he understood and would
be willing to waive his rights, and defendant signed the separate
waiver statement at the bottom of the form. Nobis witnessed the
entire exchange and confirmed the times written on the form: the
form was given to defendant at 7:45 a.m. and defendant completed
reading, initialing, and signing the form at 7:50 a.m. See U.S.
Exh. 1.

Kelley then questioned defendant about the case and took
extensive notes. In accordance with U.S. Postal Inspection Service
policy, no audio or video recording of the interview was made.[2]

---

individual is willing to discuss and answer questions, does not
want a lawyer at this time, understands and knows what he is doing,
and has not been the subject of promises, threats, pressure, or
coercion, below which defendant again signed with the date
(11/3/11) and time (7:50 a.m.). U.S. Exh. 1.

  [2] This policy should be reconsidered because an audio and/or
video recording provides a better record for the Court and would
have obviated the need for this hearing.

During the course of the interrogation, defendant allegedly admitted to portraying himself as a modeling agent and to enticing the mother to expose her 10-year-old daughter naked on the webcam. Defendant disputes that he made these inculpatory statements. Defendant never refused to answer a question throughout the interview. He was not handcuffed, and Kelley's gun remained holstered. Kelley never told him he was under arrest. At some point during the search, defendant saw his mother, who lives next door, attempt to approach and speak with him, but she was prevented from entering the property because officers were still collecting evidence. At the end of the interview more than two hours later, Kelley asked defendant to sign consent forms to search his car, as well as to take over his email and Facebook accounts. Kelley also asked if defendant would be willing to make a written statement containing his admissions. Defendant signed all the consent forms but refused to write out a statement.

The search was completed by 11:01 a.m. Defendant agreed to accompany Kelley to the courthouse and rode with Eckhardt in his cruiser. Eckhardt testified that he told defendant he was not under arrest and was free not to accompany them. Defendant testified he was in handcuffs during the drive to the courthouse.

Several hours later that afternoon, law enforcement obtained a criminal complaint from the U.S. District Court for the District of Massachusetts and arrested defendant.

**CONCLUSIONS OF LAW**

**1. Custodial Interrogation**

Defendant claims that he was not given <u>Miranda</u> warnings prior to his interview with Kelley, and that he therefore did not knowingly and voluntarily waive his rights before making any statements. The threshold question is whether defendant was in custody when he was in the car during the interrogation.

Law enforcement must inform an individual of his <u>Miranda</u> rights if questioning occurs in a custodial setting – if the individual is "taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). Outside of formal arrest, a setting is custodial when "the circumstances surrounding the questioning . . . would cause a reasonable person to have understood his situation to be comparable to a formal arrest." <u>United States v. Guerrier</u>, 669 F.3d 1, 6 (1st Cir. 2011). "Several factors guide this [custody] analysis, including (without limitation) where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation." <u>Id.</u> (citation and quotation marks omitted). Of these, "the element that carries the most weight is the level of physical control that the agents exercised over the defendant during the search and interrogation." <u>United States v. Mittel-Carey</u>, 493 F.3d 36, 40 (1st Cir. 2007). The reasonable person test

is objective, and thus independent of an individual's age or history with law enforcement, as well as of an officer's subjective and undisclosed view of the individual as a suspect. See Yarborough v. Alvarado, 541 U.S. 652, 667-68 (2004); Stansbury v. California, 511 U.S. 318, 324 (1994).

The custody determination in this case is not clear-cut. Defendant was not given freedom of movement while the residence was cleared, and he was under surveillance while he dressed and went to the bathroom. He was interrogated for more than two hours, and not in his home but in a police vehicle. His parents were not allowed to come onto the property to talk to him. The house was surrounded by six police officers, some of whom had guns drawn while the residence was cleared. In an analogous situation, the First Circuit found that a reasonable person "would believe he was not at liberty to terminate the interrogation and leave." Mittel-Carey, 493 F.3d at 40 (noting that defendant was "awakened at 6:25 AM by [eight] law enforcement officers (one with an unholstered gun)," and "interrogated for up to two hours and not permitted freedom of movement within his own home").

The government points out that defendant could have easily walked to the house next door where his mother and father lived. In addition, Kelley testified that he explicitly told defendant he was free to leave after the residence was secured. Defendant denied that he was told this. While the issue is close, the Court finds

9

that once law enforcement asked defendant to answer questions in the police vehicle, he reasonably believed he was not free to leave.

## 2. __Miranda Warnings__

If a defendant makes statements in a custodial interrogation, the government is required to prove by a preponderance of the evidence that Miranda warnings were given. Berghuis v. Thompkins, 560 U.S. 370, 384 (2010). Here, the government has provided overwhelming proof that defendant was given his Miranda warnings prior to questioning. The Miranda form contains defendant's signature and his note of the date and time, which are fully consistent both with police logs and with the testimony of the two law enforcement officers who witnessed defendant's reading and signing of the form.[3] Defendant was not credible concerning the sequence of events. The Court finds that defendant read and understood his rights, and that the waiver was knowing.

## 3. __Voluntary Waiver__

Defendant asserts that he was coerced into signing the Miranda form. The government is required to prove by a preponderance of the evidence that a defendant's waiver of his Miranda rights was voluntary. Berghuis, 560 U.S. at 384 (citing Colorado v. Connelly,

---

[3] Eckhardt called in the residence as "all clear" at 7:46 a.m., see U.S. Exh. 5, and the Miranda form was given to defendant at 7:45 a.m., see U.S. Exh. 1. Together, these corroborate Kelley's testimony that he began his interview with defendant after the house was secured.

479 U.S. 157, 168 (1986)). The waiver must be "the product of a
free and deliberate choice rather than intimidation, coercion, or
deception." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>see also</u>
<u>Connelly</u>, 479 U.S. at 170 ("The voluntariness of a waiver of this
privilege has always depended on the absence of police
overreaching, not on 'free choice' in any broader sense of the
word."). For example, falsely threatening to separate a mother from
her child if she refuses to cooperate qualifies as coercion. <u>United</u>
<u>States v. Byram</u>, 145 F.3d 405, 408 (1st Cir. 1998) (citing <u>Lynumn</u>
<u>v. Illinois</u>, 372 U.S. 528, 534 (1963)). Falsely threatening to
arrest a suspect's elderly mother when he refused to admit to gun
possession also forced an involuntary confession. <u>United States v.</u>
<u>Andrews</u>, 847 F. Supp. 2d 236, 249-50 (D. Mass. 2012).

Defendant testified that Kelley threatened to arrest his
pregnant wife if defendant required Kelley to administer his
<u>Miranda</u> rights, or if defendant refused to answer Kelley's
questions during the interrogation.[4] The Court finds that Kelley

---

[4] <u>See</u> Mot. to Suppress, Def. Aff., (Docket No. 94-1), ¶ 5-7:

> Inspector Kelley started talking to me immediately
> without reading me <u>Miranda</u> rights. He asked about some
> baby items in the house and about my wife. I informed him
> that my wife was about three months pregnant. . . .
> Kelley told me that he 'could' read me my <u>Miranda</u> rights
> but that if he did, I would no longer be 'just helping
> them out'. . . . Kelley also said that if he read me my
> rights, he would have to also arrest my wife, Barbie, and
> that I should 'want to avoid that kind of stress for her
> in her condition'. . . . When I hesitated to answer, he
> stated that I had to answer all of his questions

was truthful when he said that he did not make this threat. Defendant's credibility was undermined by his clearly false testimony regarding both the timing of the <u>Miranda</u> warnings, and the use of his cell phone in calling a second minor girl in California. Kelley did not coerce, intimidate, or otherwise deceive defendant so as to override his will. The Court finds that defendant's statements during Kelley's interrogation were voluntary.


**ORDER**

The Court **DENIES** Defendant's Motion to Suppress.


     /s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge

---

otherwise I would no longer be 'just helping out' and he would arrest both my wife and [me], and that we would still have to answer his questions anyway.

Defendant also testified at the suppression hearing and reconfirmed these allegations.